**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CACHET BECKHAM, et al.,** | ) | **CASE NO.  1:14 CV 696** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **CITY OF EUCLID, OHIO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Motion for Summary Judgment filed by Defendants, City of Euclid, Renee McIntyre and Vic Stepec (Docket #64) and the Motion for Summary Judgment filed by Defendants, Steven Buy, Sherri Travis and Robert Nolan (Docket #65).

**Factual Background**[1]

On February 15, 2013, police officers responded to a domestic dispute at the apartment of Cachet Beckham and Marcus Lewis ("Plaintiffs") and, based on their observations and discussions with Plaintiffs, issued Plaintiffs tickets for possession of drug paraphernalia and cultivation of marijuana in the vicinity of a juvenile. On February 28, 2013, Plaintiffs appeared in the Euclid Municipal Court and pled no contest to the charges against them. Plaintiffs were

---

[1] Except as otherwise noted, the factual summary is based upon the undisputed facts as set forth by the Parties and, to the extent any disputes exist, such disputes will be construed in the light most favorable to Plaintiffs as required under the summary judgment standard.

found guilty and fined several hundred dollars. Plaintiffs then filed Motions with the Euclid Municipal Court requesting that each be permitted to perform community service in lieu of paying fines and court costs. On March 1, 2013, Judge Deborah LeBarron granted Plaintiffs' Motions and ordered them to appear at the Euclid Municipal Court Probation Department in person within ten days to arrange community service.

### Community Service Scheduling Procedure

The Euclid Municipal Court Probation Department does not have written procedures for tracking defendants ordered to complete community work service in lieu of paying court costs and fines. Generally, the Judge's Order permitting community service is placed in the Probation Department's mailbox located in the Clerk of Court's Office. Throughout the day, Probation Officers pick up the mail and bring it to the Probation Department, where it is sorted and placed in the correct mailbox within the Probation Department. Court Orders permitting community service are placed in Probation Officer Steven Buy's mailbox and he then places the Court Orders in a manila folder located in a separate slot in the Probation Department mailbox. The folder is then reviewed periodically to determine whether any individuals failed to appear to schedule their community service and a warrant is requested and issued for defendants who failed to comply. Chief Probation Officer Sherri Travis set this process in place and, during the time period in question, Probation Officer Buy monitored the community service orders for compliance. (Travis Depo. at p. 32.)

Upon arrival at the Probation Department, individuals who have been granted permission to complete community service must sign in and are required to note "CWS," for Community Work Service, next to their name. A Probation Officer meets with the individual defendant and retrieves the corresponding Court Order from the manila folder. The individual is given an

"Option Form," by which he or she may choose one of two community service options – to complete community service through the Euclid Municipal Court or sign up to complete community service through an independent third party, "Court Community Service." If Court Community Service ("CCS") is chosen, the Probation Officer provides the individual with necessary information; fills out a "Referral Form;" and, faxes the Option Form, Referral Form and original Court Order to CCS. The Probation Officer then places the Option Form, the Referral Form and the Court Order in Probation Officer Buy's mailbox stapled together. Probation Officer Buy then removes the packet of documents from the mailbox and files it alphabetically in a three-ring binder. The documents stay in the binder until the defendant completes his or her community work service requirement.

### Plaintiffs Schedule and Begin Community Service as Required

On March 7, 2013, Plaintiffs arrived that the Euclid Probation Department; signed in; and, met with Chief Probation Officer Travis. Chief Probation Officer Travis obtained copies of the Court Orders permitting Plaintiffs to perform community work service in lieu of fines and costs. Plaintiffs filled out the Option Form, by which they chose to complete their community service through CCS, which would permit them to schedule community service so as not to conflict with their employment schedules. Chief Probation Officer Travis filled out the required Referral Forms for CCS and explained how much time Plaintiffs had to complete their community service (by May 7, 2013) and where they should report. Chief Probation Officer Travis then faxed the paper work to CCS and testified that she placed the completed paperwork in Probation Officer Buy's mailbox. Plaintiffs called CCS and set up an appointment to begin performing community service and drove to CCS offices in downtown Cleveland on March 25,

2013 to pay their fees and get their assignments.  They were assigned to work Mondays, Wednesdays and Thursdays at the Goodwill store in Eastlake, Ohio.

**Warrants Issued and Arrests**

On March 14, 2013, three days after Plaintiffs' deadline to report and seven days after Plaintiffs had actually reported to the Probation Department, Probation Officer Buy checked the manila folder containing Court Orders permitting community service.  Despite the fact that Plaintiffs had already signed up and begun their community service as required, the Court Orders for Plaintiffs were still in the folder.  Chief Probation Officer Travis testified that the Court Orders may have been received and placed in the folder after Plaintiffs had already reported to the Probation Department or that it is possible she forgot to move them from the folder.  Probation Officer Buy believed Plaintiffs were past the 10-day deadline set forth in the Court Order, and placed their name on a Memorandum to Judge LeBarron entitled "Warrants Requested for Failure of Community Service."  The Memorandum was filed with the Clerk of Courts. While his Affidavit indicates he based his determination that Plaintiffs failed to comply with the Court Order on the fact that the Order was still in the manila folder past the deadline, Probation Officer Buy testified that he also reviewed his computer records and checked his paperwork binder and found nothing to indicate Plaintiffs had signed up for community service. (Buy Depo. at p. 49.)   He did not check the Probation Department sign-in sheets to see if Plaintiffs had visited the Probation Department.  There is no evidence in the record that a mistake such has this has happened on any other occasion within the Euclid Municipal Court Probation Department.

On March 15, 2013, Judge LeBarron ordered warrants be issued for the arrest of

-4-

Plaintiffs for failure of community service and set bond for $5,000.00 at ten percent. On March 18, 2013, Sue Klepac, a Deputy Clerk of the Euclid Municipal Court, issued the arrest warrants. Plaintiff, Marcus Lewis received a letter in the following days indicating that there was an arrest warrant for "failure to complete community service." Mr. Lewis testified that he called the number on the letter and left a voicemail. Mr. Lewis indicated that someone called him back, but he was unable to answer. Mr. Lewis called the number two more times, but never spoke to anyone. Mr. Lewis did not call the Euclid Municipal Court, the Euclid Municipal Court's Probation Department or Court Community Service.

On March 28, 2013, at approximately 4:00 p.m., as Plaintiffs were returning from their second day of community service and were on their way to pick up their three children from day care, they were arrested at a gas station by Wickliffe Police. They were handcuffed and placed in separate police cars. Bailiff Robert Nolan, a Euclid Municipal Court Deputy, was advised that Wickliffe Police had stopped and detained Plaintiffs based upon the Arrest Warrants issued by the Euclid Municipal Court. Bailiff Nolan pulled the Warrant Files for both Plaintiffs from the file room. Bailiff Nolan drove to the border of Euclid and Wickliffe to meet the Wickliffe police officers who had Plaintiffs in custody. Bailiff Nolan informed Plaintiffs that they were arrested for failure of community service and a copy of the Warrants would be provided to them. Both Plaintiffs were handcuffed in the front and placed in the back of his car.

Plaintiffs informed Bailiff Nolan that they were coming from community service at the time they were arrested; that they were on their way to pick up their three children from day care which would be closing; and, that their arrest was a mistake. Plaintiffs also informed him that Plaintiff Cachet Beckham was pregnant and suffering nausea. Plaintiffs had paperwork from CCS with them, indicating the address of the Eastlake Goodwill and the dates and starting times,

-5-

along with the yellow receipts from CCS dated March 25, 2013 for payment of $65.00 each. Bailiff Nolan testified that he was unable to verify Plaintiffs' claims because the Euclid Municipal Court was closed at the time because of the Easter holiday. He drove Plaintiffs to the Euclid Jail where they were processed and provided with copies of the Arrest Warrants. Plaintiffs repeated the information regarding the fact that they were being arrested in error to the booking officers – City of Euclid Police Officers Renee McIntyre and Vic Stepec. Plaintiffs claim that Officers McIntyre and Stepec refused to look into the matter further, despite begging them to do so, and indicated that Plaintiffs must have done something wrong for a warrant to be issued. Ms. Beckham asserts was not permitted a phone call until 8:00 p.m., despite the fact that her children were alone at day care, which would be closing at 6:00 p.m. Ms. Beckham was later transferred to the Lake County Correctional Institute because the Euclid Municipal Jail was unable to house women. Neither was able to post bond.

On April 1, 2013, Mr. Lewis appeared in front of Judge LeBarron, who released him, vacated his community service and suspended his costs and fines based on the fact that he had in fact complied with the Court community service Order. On April 2, 2013, Ms. Beckham was transferred back to the Euclid Municipal Court and appeared before Judge LeBarron, who released her, vacated her community service and suspended her fines and costs for the same reason. Ms. Beckham suffered from pregnancy related nausea while in jail; lost her job for failure to report; her car was towed and her children stayed with her elderly grandmother.

**Procedural Background**

Plaintiffs filed their initial Complaint in this case on March 29, 2014, and subsequently file an Amended Complaint on March 27, 2015 with leave of Court. (Docket #48.) In Count I, Plaintiffs allege violations of 42 U.S.C. §§ 1983 and 1988 against Defendants Buy, Travis,

-6-

Nolan, MacIntyre and Stepec in their individual capacities under the Fourth and Fourteenth Amendments for Unreasonable Seizure and Detention. Plaintiffs allege that there was no basis upon which to issue warrants for their arrest; that they were arrested and detained despite the fact that they knew or should have known the arrest was without cause; and, that Defendants acted with willful or reckless disregard for their rights. In Count II, Plaintiffs allege violation of 42 U.S.C. § 1983 against Defendants City of Euclid, Buy and Travis in their official capacities under the Fourth and Fourteenth Amendments, alleging that Ms. Travis and Ms. Buy knew or should have known that a Court order for community service could end up in the "manila file" after an individual appeared in person to schedule community service, thereby resulting in an unlawful arrest, and that the City of Euclid recklessly tolerated and permitted the Probation Officers to continue this practice. In Count III, Plaintiffs allege violation of 42 U.S.C. § 1983 against Defendants Nolan, McIntyre and Stepec in their official capacities, and against the City of Euclid, under the Fourth and Fourteenth Amendments. Plaintiffs assert that the City of Euclid knew or should have known of the policies and practices of the City Police Department and other personnel which cause the deprivation of Plaintiffs' rights; failed to properly train its police and corrections as to the correct procedure and circumstances in which an officer may arrest or detain an individual; and that Officer Nolan, McIntyre and Stepec acted under the official policy or custom of Euclid which resulted in the deprivation of Plaintiffs' rights. In Count IV, Plaintiffs alleged a State law claim of negligent identification by Defendants Buy and Travis individually, stating that they owed Plaintiffs a duty to conduct a reasonable investigation regarding where they had violated the Court Orders prior to seeking warrants for their arrest.

On September 21, 2015, Defendants City of Euclid, Renee McIntyre and Vic Stepec ("the City of Euclid Defendants") filed their Motion for Summary Judgment and, on September 21, 2015, Defendants, Steven Buy, Sherri Travis and Robert Nolan ("Euclid Municipal Court

Defendants") filed their Motion for Summary Judgment. (Docket #s 64 and 65.) Plaintiffs filed their Opposition Brief on November 6, 2015. On November 25, 2015, the City of Euclid Defendants and the Euclid Municipal Court Defendants filed their Reply Briefs. (Docket #s 72 and 73.) Plaintiffs filed a Sur-Reply Brief on December 18, 2015. (Docket #73.)

### Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine [dispute] of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) reads as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

## Discussion

**I.    City of Euclid Defendants.**

    **A.    Police Officers McIntyre and Stepec – Individual Capacity.**

The doctrine of qualified immunity generally shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citing *Malley v. Briggs*, 475 U.S. 511, 526 (1985)). In determining whether a defendant is entitled to qualified immunity, the Court considers (1) whether a violation of a Constitutional right occurred and (2) whether the Constitutional right at issue was clearly established at the time of the defendant's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court must also consider "whether the official's action was objectively unreasonable under the circumstances." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. Ohio 2008).

An arrest pursuant to a facially valid warrant is normally a complete defense to a Federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983. *Voyticky v. Timberlake*, 412 F.3d 669, 677 (6th Cir. Ohio 2005) (citing *Baker v. McCollan*, 443 U.S. 137,

143-44 (1979)). Similarly, under Ohio law, an arrest warrant, "issued by a court, unless utterly void is a complete defense to an action for false arrest or false imprisonment." *Id.* (citing *McFarland v. Shirkey*, 106 Ohio App. 517, 151 N.E.2d 797, 802 (Franklin Cty. 1958)). The Arrest Warrants at issue in this case were ordered by Judge LeBarron and issued by Deputy Clerk of Court Sue Klepac pursuant to Ohio Rev. Code § 2705.02-2705.03 for contempt of Court for what Probation Officer Buy reasonably and in good faith believed to be a failure to comply with the Court's Orders permitting community service.

Plaintiffs were arrested on facially valid arrest warrants and booked by City of Euclid Police Department Officers McIntyre and Stepec. There are no allegations that Plaintiffs were mistreated by McIntyre, Stepec, or anyone else during their arrest and incarceration. Although Plaintiffs told the Officers that their arrest was a mistake, Officers McIntyre and Stepec were under no obligation to release Plaintiffs pending further investigation. *Gardenhire v. Schubert*, 205 F.3d 303, 316 (6th Cir. Tenn. 2000); *Masters v. Crouch*, 872 F.2d 1248, 1253 (6th Cir. Ky. 1989) (holding "police . . . may rely on facially valid arrest warrants even in the face of vehement claims of innocence by reason of mistaken identity or otherwise." (citing *Baker v. McCollan*, 443 U.S. at 145). Officer's McIntyre and Stepec acted pursuant to facially valid warrants issued by the Clerk of Courts of the Euclid Municipal Court against Plaintiffs – a complete defense to Plaintiffs claims; the Officers did not knowingly or intentionally violate Plaintiffs' Constitutional rights; and, both are entitled to qualified immunity. Accordingly, Defendants McIntyre and Stepec are entitled to summary judgment as to Plaintiffs' Section 1983 claims brought against them in their individual capacities.

  **B.**  **The City of Euclid.**

The Sixth Circuit has held that "in order to state a claim against a city or a county under § 1983, a plaintiff must show that his injury was caused by an unconstitutional 'policy' or 'custom' of the municipality or the county." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. Ky.1997). *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Plaintiffs have offered no evidence that a custom or policy of the City of Euclid caused the alleged deprivation of rights. Further, Plaintiffs have offered no evidence that the City of Euclid failed to properly train Officers McIntyre and Stepec; the Officers' actions were taken pursuant to facially valid Arrest Warrants; and, there is no evidence of an actionable Constitutional violation. Therefore, Plaintiffs' claims against the City of Euclid fail as a matter of law.

### C. Police Officers McIntyre and Stepec – Official Capacity.

Police Officers McIntyre and Stepec are entitled to summary judgment as to Plaintiffs' Section 1983 claims brought against them in their official capacities. Because a suit against a government official in his official capacity is treated as a suit against the government entity, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), McIntyre and Stepec are liable in their official capacities only if an official policy or custom caused a Constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). As stated above, McIntyre and Stepec are employees of the City of Euclid and there is no evidence of an official policy or custom of the City of Euclid that caused a Constitutional violation. Further, there is no evidence that Officers McIntyre and Stepec violated Plaintiffs' Constitutional rights in any way. Accordingly, Defendants are entitled to summary judgment as to Plaintiffs' Section 1983 claims brought against Officers McIntyre and Stepec in their official capacities.

### II. Euclid Municipal Court Defendants.

### A. Euclid Municipal Court Bailiff Nolan – Individually.

Euclid Municipal Court Bailiff Robert Nolan drove to meet the City of Wickliffe Police Officers that had arrested Plaintiffs and drove Plaintiffs to the City of Euclid Jail.  Federal courts have held that absolute judicial immunity extends to officers performing bailiff functions at the Court's instruction.  *Rodgers v. County of Ionia*, Case No. 5:00-CV-134, 2001 U.S. Dist. LEXIS 4445, *11 (W.D. Mich. 2001) (citing *Martin v. Hendren*, 127 F.3d 720 (8th Cir. Ark. 1997); *Robinson v. Freeze*, 15 F.3d 107 (8th Cir. Ark. 1994); *Dellenbach v. Letsinger*, 889 F.2d 755, 762 (7th Cir. Ind. 1989); *Haldane v. Chagnon*, 345 F.2d 601 (9th Cir. Cal. 1965); *Nabkey v. Gibson*, 923 F. Supp. 117, 121 (W.D. Mich. 1996)).  Bailiff Nolan pulled the Warrant Files for both Plaintiffs; drove to the border of Euclid and Wickliffe to meet the Wickliffe Police Officers who had Plaintiffs in custody; informed Plaintiffs that they were arrested for failure of community service and a copy of the Warrants would be provided to them; and, both Plaintiffs were handcuffed in the front and placed in the back of his car for transport to the City of Euclid Jail, all of which are required functions of his job as Bailiff.  Accordingly, Bailiff Nolan is entitled to immunity from Plaintiffs' claims.

Furthermore, like the City of Euclid Officers McIntyre and Stepec, Bailiff Nolan acted pursuant to facially valid arrest warrants; was under no obligation to release Plaintiffs pending further investigation; there are no allegations that Bailiff Nolan mistreated Plaintiffs in any way; there is no evidence that Bailiff Nolan knowingly or intentionally violated Plaintiffs' rights; and, Bailiff Nolan is thus entitled to qualified immunity from Plaintiffs' claims against him in his individual capacity.

### B. Probation Officers Travis and Buy – Individually.

Probation Officers Travis and Buy are also immune from Plaintiffs' claims.  A probation officer performing duties to ensure that a probationer is complying with the terms of probation and evaluating that compliance is entitled to quasi-judicial immunity from liability in a civil rights action.  *See Loggins v. Franklin County, Ohio*, 218 F. App'x 466, 476-77 (6th Cir. Ohio 2007); *Timson v. Wright*, 532 F.2d 552, 552 (6th Cir. Ohio 1976).  Plaintiffs' claims against Probation Officers Travis and Buy concern the performance of their duties as Probation Officers – in this case to implement and track compliance with Court ordered community service.  As such, Plaintiffs' claims against Probation Officers Travis and Buy fail as a matter of law.  *See Trofatter v. Michigan Dep't of Corrections*, 1:09 CV 33, 2009 U.S. Dist. LEXIS 13133, * 6-7 (W.D. Mich. Feb. 20, 2009); *Balas v. Leishman-Donaldson*, Case No. 91-4073, 1992 U.S. App. LEXIS 22411, *13-14 (6th Cir. Ohio Sept. 9, 1992) (a probation officer performing duties to ensure a probationer was complying with the terms of probation was entitled to quasi-judicial immunity); *Schuh v. Pollard*, Case No. 08-10482, 2009 U.S. Dist. LEXIS 85535,  (E.D. Mich. Sept. 15, 2009) (quasi-judicial immunity has been applied to probation officers performing duties to ensure that a probationer was complying with the terms of probation).

To the extent it could be argued that Probation Officers Buy and Travis were performing non-judicial tasks, Probation Officers Buy and Travis are otherwise entitled to qualified immunity.  The evidence demonstrates a mistake was made during the processing of Plaintiffs' community service paperwork which led to their arrest.  Plaintiffs cannot survive summary judgment without any evidence to establish that Probation Officers Travis or Buy's actions were something other than inadvertent.  There is no evidence that either Probation Officer Travis or Buy acted recklessly or intentionally with regard to Plaintiffs' paperwork or requesting that the

-13-

Warrants be issued. At best, the evidence demonstrates a one-time mistake, not knowing or intentional behavior designed to violate Plaintiffs' Constitutional rights. *Ahlers v. Schebil*, 188 F.3d 365, 373-74 (6th Cir. Mich. 1999). "Proof of negligence or innocent mistake is insufficient" to maintain a false arrest or false imprisonment claim under § 1983. *Id.* at 373 (quoting *Lippay v. Christos*, 996 F.2d 1490, 1501( 3rd Cir. 1993)).

### C. Bailiff Nolan and Probation Officers Travis and Buy – Official Capacity

A suit against a government official in his official capacity is treated as a suit against the government entity, *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). Bailiff Nolan and Probation Officers Travis and Buy are liable in their official capacities only if an official policy or custom caused a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Bailiff Nolan and Probation Officers Travis and Buy are employees of the City of Euclid Municipal Court. Official capacity claims against employees of the Court equate to claims against the State of Ohio. Absent consent of the State of Ohio, no suit for monetary damages can be maintained against the State, or any court which is considered an arm of the State of Ohio, under the doctrine of sovereign immunity provided for by the Eleventh Amendment. *See generally Smith v. Grady*, 960 F. Supp. 2d 735, 751 (S.D. Ohio 2013) (citing *Mumford v. Basinski*, 105 F.3d 264, 269 (6th Cir. Ohio 1997); *Alkire v. Irving*, 330 F.3d 802-811-13 (6th Cir. Ohio 2003); *Triplett v. Connor*, 109 Fed. App'x 94, 96 n.4 (6th Cir. Ohio 2004). The City of Euclid Municipal Court is not a legal entity that is capable of being sued. *See, e.g., Lawson v. City of Youngstown*, 912 F. Supp. 2d 527, 530 (N.D. Ohio 2012); *Williams v. City of Columbus, Ohio*, 892 F. Supp. 2d 918, 923-24 (S..D. Ohio 2012) (dismissal of municipal court "because

under Ohio law, Ohio courts are not *sui juris*"); see also *Malone v. Court of Common Pleas of Cuyahoga County*, 45 Ohio St.2d 245, 248 (quoting *State ex rel. Cleveland Municipal Court v. Cleveland City Council*, 34 Ohio St.2d 120, 121 (1973)) ("Absent express statutory authority, a court can neither sue nor be sued in its own right.").  Further, to the extent Plaintiffs argue Bailiff Nolan and Probation Officers Travis and Buy are employees of the City of Euclid, as the Court explained above, there is no evidence of an official custom or policy of the City of Euclid that caused a Constitutional violation, nor is there, as alleged by Plaintiffs, evidence that the City of Euclid recklessly tolerated and permitted the Probation Officers to process requests for community service in an unlawful manner.  The evidence presented to the Court demonstrates a one-time, inadvertent mistake, not a policy, practice or custom of the City of Euclid depriving Plaintiffs of their Constitutional rights.

Accordingly, Plaintiffs' official capacity against Bailiff Nolan and Probation Officers Travis and Buy fail as a matter of law.

### D. State Law Negligent Identification Claim - Probation Officers Travis and Buy – Individual Capacity.

Plaintiffs turn to an argument of "reckless" identification in an attempt to save their State law negligence claim.  However, as stated above, there is no evidence to support any claim of recklessness on the part of any of the Defendants.  The evidence indicates that a mistake was made in the processing of Plaintiffs' paperwork in the Probation Department, nothing more.

Plaintiffs do not dispute that under Ohio law, employees of political subdivisions are immune from claims of negligence.  Ohio Rev. Code § 2744.03(A)(6).  Therefore, it follows that a claim for "negligent" identification against Probation Officers Travis and Buy cannot withstand summary judgment.

**Conclusion**

It is undisputed that a mistake was made by someone in the Probation Department in processing the completed paperwork regarding Plaintiffs' court-ordered community service which ultimately resulted in Plaintiffs' arrest.  All Parties in this case agree that the circumstances presented to the Court are unfortunate and regrettable, as Plaintiffs had indeed complied with all of the requirements of the Municipal Court's Order.  However, there is no evidence of actionable conduct against any of the individual Defendants, nor is there evidence of an official custom or policy, or a failure to train, for which the City of Euclid could be held liable.  For the foregoing reasons, the Motions for Summary Judgment filed by Defendants, City of Euclid, Renee McIntyre and Vic Stepec (Docket #64), and Defendants, Steven Buy, Sherri Travis and Robert Nolan (Docket #65), are hereby GRANTED.

This case is hereby TERMINATED.

IT IS SO ORDERED.

       s/Donald C. Nugent
       DONALD C. NUGENT
       United States District Judge

DATED: December 29, 2015